**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

JOHN J. GILLESPIE and UVC, INC. t/a  :
MILL CREEK TAVERN,                    :
                                      :
    Plaintiffs,                       :          CIVIL ACTION NO. 09-4810
                                      :
        vs.                           :          JURY TRIAL DEMANDED
                                      :
THE CITY OF PHILADELPHIA,             :
JANNIE L. BLACKWELL,                  :
KENNETH GASSMAN,                      :
DANIEL ROSANOVA and                   :          **FILED**
JOHN AND JANE DOES 1-30,              :
                                      :          NOV 1   2009
    Defendants.                       :
                                                 MICHAEL E. KUNZ, Clerk
                                                 By_____Dep. Clerk

## FIRST AMENDED COMPLAINT

Plaintiffs, John J. Gillespie ("Gillespie") and UVC, Inc. t/a Mill Creek Tavern
("UVC" or "Mill Creek Tavern") (all collectively referred to as "Plaintiffs"), by and through
their undersigned attorneys, state as follows.

## INTRODUCTION

1.      This is a civil rights case, brought pursuant to 42 U.S.C. § 1983, arising
from the actions of defendants identified below who have engaged in a pattern of harassment in
an orchestrated campaign to drive Plaintiffs out of business.  Defendants have repeatedly and
wrongfully used the police powers of the City of Philadelphia and its governmental departments,
including the Department of Health ("Health Department") and the Department of Licenses &
Inspections ("L&I"), to bring unwarranted enforcement actions against Plaintiffs, have acted in
bad faith in bringing and prosecuting these enforcement actions, and have otherwise acted in a
manner shocking to the conscience in a campaign whose only purpose is to harass Plaintiffs,

cause them unbearable expense, and force Plaintiffs to close their business.  The nature of these repeated actions on the part of high-level officials and supervisors of the City of Philadelphia and its governmental departments are such that it has become the policy of the City of Philadelphia to close Plaintiffs' business.  Defendants' actions, under color of state law, have deprived Plaintiffs of their constitutional rights to due process and equal protection under the law.

## THE PARTIES

2.      Gillespie is an adult individual with a business address of 4200-02 Chester Avenue, Philadelphia, PA 19104.  Gillespie is a shareholder, officer and director of UVC.

3.      UVC is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania which maintains its principal place of business at 4200-02 Chester Avenue, Philadelphia, PA  19104.

4.      Defendant, City of Philadelphia (the "City"), is a First Class City of the Commonwealth of Pennsylvania with the following address: Law Department, 1515 Arch Street, Philadelphia, PA  19102-1501.

5.      Defendant, Jannie L. Blackwell, is an individual and member of the Philadelphia City Council with an office located at City Hall, Room 408 Philadelphia, PA  19107-3290.

6.      Defendant, Kenneth Gassman, is an individual and Construction Trades Inspector with L&I's Commercial and Industrial Fire Inspectional Unit ("C&I") located at 990 Spring Garden Street, 9th Floor, Philadelphia, PA  19123.

7.      Defendant, Daniel Rosanova, is an individual and Fire C&I Inspector, License Issuance, with L&I's C&I Fire Inspectional Unit located at 990 Spring Garden Street, 9th Floor, Philadelphia, PA  19123.

8.     John and Jane Does 1-30 are individuals currently unknown to Plaintiffs who took part in or were otherwise involved in the improper activities against Plaintiffs which form the basis of this Complaint.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over the subject matter and parties of this litigation pursuant to 28 U.S.C. § 1343(a)(3).

10.     This Court has pendent jurisdiction by virtue of 28 U.S.C. § 1367.

11.     Venue is appropriate in appropriate in this District pursuant to 28 U.S.C. § 1391(b).  All Defendants reside in and the occurrences out of which this litigation arises occurred in this jurisdiction.

## FACTUAL BACKGROUND

### The Creation of Mill Creek Tavern

12.     On or about April 24, 1986, UVC was created and registered in the Commonwealth of Pennsylvania.

13.     On or about October, 1986, Gillespie purchased a property in the City of Philadelphia located at 4202 Chester Avenue, which he continues to own to the present day in his name.

14.     Gillespie was and is to the present day the President and Treasurer of UVC and its majority stockholder.

15.     Beginning on or about April 1986, UVC operated a bar and restaurant at 4202 Chester Avenue trading under the name Track-n-Turf.

16.     On or about June, 2002, Gillespie purchased the adjoining and dilapidated property located at 4200 Chester Avenue, Philadelphia, Pennsylvania, which he continues to own

to the present day in his name. Gillespie's intention was to rehabilitate 4200 Chester Avenue and expand the operations of the bar and restaurant to occupy both 4200 and 4202 Chester Avenue ("4200-02 Chester Avenue").

17.    At the time of the purchase of 4200 Chester Avenue, the property was located in a C-1 commercial district where restaurants are generally not permitted.

### Plaintiffs Seek a Permit to Expand Operations

18.    On or about September 2002, Plaintiffs applied to the Zoning Board of Adjustment ("ZBA") for a variance in order to expand the operations of the non-conforming bar at 4200 Chester Avenue to occupy both 4200-02 Chester Avenue.

19.    On or about November 25, 2002, a hearing was held before the ZBA in which testimony was heard from neighbors, including representatives of the Spruce Hill Community Association ("SHCA") and the University of Pennsylvania, who supported the proposed expansion and from others, including members of the Regent Square Civic Association ("RSCA"), who opposed the expansion.

20.    On or about December 12, 2002, the ZBA granted the variance and permitted the expansion of the non-conforming use, with the exception of a proposed outdoor deck.

21.    Both before and after the ZBA hearing and its decision, Gillespie was in continuous discussions and negotiations with his neighbors, including representatives of the SHCA, the RSCA and the University of the Sciences in Philadelphia ("USP") regarding the proposed expansion.

22.    In a spirit of cooperation and in order to address his neighbors' concerns, Gillespie voluntarily agreed to certain restrictions in his expansions and operations primarily

4

related to building design, noise reduction, security, cleanliness, parking, landscaping and lighting.

23.     Some neighbors, including members and officers of the RSCA, were dissatisfied with the decision of the ZBA to allow an expansion of the bar and restaurant and appealed the decision to the Court of Common Pleas.

24.     On or about November 25, 2003, the Court of Common Pleas affirmed the decision of the ZBA.

25.     An appeal was taken to the Commonwealth Court which also upheld the ZBA's decision to permit Plaintiffs to expand the bar and restaurant.

26.     Plaintiffs obtained proper permits from L&I for the renovation and expansion work.

27.     L&I regularly inspected the renovations and other construction throughout the course of the expansion and renovation project.

28.     Plaintiffs expanded their business operations to occupy 4200-02 Chester Avenue and began operating the bar and restaurant under the new name Mill Creek Tavern.

**Plaintiffs' Neighbors Enlist Defendant Blackwell to Shut Down Mill Creek Tavern**

29.     On information and belief, members of the RSCA, officials of the USP and/or other neighbors of Mill Creek Tavern, frustrated that Plaintiffs had expanded their operations despite their opposition, sought the assistance of Defendant Blackwell to close Mill Creek Tavern.

30.     On information and belief, in order to gain favor from members of the RSCA, officials of the USP and or other neighbors of the Mill Creek Tavern, Defendant Blackwell decided to seek the closure of Mill Creek Tavern.

31.     On information and belief, Defendant Blackwell and/or members of her staff or other agents of Blackwell acting under her direction, contacted senior officials and supervisors at the Health Department and requested their assistance in shutting down Mill Creek Tavern.

32.     Defendant Blackwell's actions in contacting senior officials and supervisors at the Health Department were not actions in her legislative capacity nor were they the good faith actions of a public official responding to violations of the law.

33.     To the contrary, Defendant Blackwell acted at all times without regard to the actual facts of the situation or the due process rights of Plaintiffs and instead acted arbitrarily and capriciously to deprive Plaintiffs of their use and enjoyment of their property and their protected liberty interest in operating their business.

34.     The City applied pressure to Plaintiffs through various channels of intimidation including, but not limited to, the activity set forth below.

**The Health Department Begins its Activity Against Plaintiffs**

35.     On information and belief, in response to the request of Defendant Blackwell or her agents, senior officials and supervisors at the Health Department entered into a conspiracy with Defendant Blackwell and made the deliberate decision to shut down Mill Creek Tavern under color of Health Department violations.

36.     At all times relevant, the City of Philadelphia has delegated to the Health Department final policymaking authority for all matters related to food safety at businesses, including restaurants, which serve food in the City of Philadelphia. This policymaking authority includes the authority to enforce all City laws, regulations and ordinances dealing with food safety and related health issues, to conduct inspections, issuing notices of violations, and

otherwise act as the decision-makers as to which food establishments may operate in the City of Philadelphia.

37.     At all times relevant, senior officials and supervisors of the Health Department were delegated final policymaking authority with regard to food safety at restaurants in the City of Philadelphia.

38.     At all times relevant, senior officials and supervisors of the Health Department were aware of and approved of the actions of their subordinates.

39.     Beginning on or about May 10, 2004, the Health Department began regular food safety inspections of Mill Creek Tavern.  On many of these occasions, Health Department inspectors alleged critical violations.

40.     On information and belief, these inspections were not conducted in good faith by the Health Department inspectors, but rather the results were exaggerated with the purpose of creating a paperwork trail that would allow the Health Department to shut down Mill Creek Tavern.

## The Water Department Gets Involved

41.     In or around April 2006, the City filed an action relating to the alleged amounts owed for water and sewage for property owed by Gillespie at 527 South 42nd Street (a residential apartment complex) in the Philadelphia Court of Common Pleas, April Term 2006. No. 22130 MLD (the "Water Department Action")

42.     By April 24, 2006 the City had obtained a lien for unpaid water/sewer in the amount of $22,511.34.[1]

---

[1]     The Water Department Action would not be resolved until 2009 (see, infra, ¶¶ 202-204).

43.    In or around late July or early August 2006, Gillespie was notified that the City's Water Revenue Tax Unit ("WRTU") was making a claim for approximately $60,000.00 in charges, penalties and interest relating to water and sewer usage at 4202 Chester Avenue.

44.    In response, Gillespie vehemently denied the amount claimed by the WRTU was due and owing for water and sewer usage based on prior usage figures (neither Plaintiffs use of the premises nor their water and sewer usage had changed during the period at issue).

45.    On or about October 17, 2007, Gillespie filed a Petition for Appeal with the City's Office of Administrative Review in connection with 4202 Chester Avenue. The basis of the Petition was that between September 2003 and August 2005, Gillespie's bills were based on estimated readings from a defective water meter. Gillespie's water bills during this twenty-seven month period, including penalties, averaged approximately $1,900.00 per month. Gillespie's meter was replaced in August or September 2005 and thereafter his average bills were about $130.00 per month.

46.    On December 10, 2007 a hearing was held before a Master appointed by the Philadelphia Tax Review Board ("TRB"). Although the Master acknowledged that he did not have authority to hear Gillespie's appeal because the amount in question (in excess of $60,000) was beyond his authority and he was not able to hear matters relating to commercial property, the Master nevertheless determined that Gillespie owed the amounts claimed by the WRTU.

47.    Upon receiving the Master's decision, Gillespie immediately appealed the decision of the decision to the TRB.

48.    In January 2008, the TRB granted Gillespie's request for a rehearing.

49.     Although the TRB had granted a request for a rehearing (which had not yet been rescheduled), in or around April 2008 and thereafter, the City attempted to shut off the water at 4202 Chester Avenue.

50.     Ultimately, after incurring significant legal fees and expenses and years of challenging the amount claimed by the WRTU, in August 2009, three years after the issue was first raised and just one day prior to the scheduled hearing before the full TRB, the Philadelphia Water Revenue Bureau miraculously adjusted the amount owed from $62,425.92 to a mere $521.56.

**The City Seeks Formal Closure of Mill Creek Tavern Through the Health Department**

51.     On or about May, 2006, the City filed a case captioned _City of Philadelphia v. UVC, Inc. and John Gillespie_ (May Term 2006, No. 185) ("the Health Department Case") in the Municipal Court Criminal Division seeking closure of the Mill Creek Tavern.

52.     The issues in the Health Department Case were primarily: (1) uncorrected critical violations allegedly found by the Health Department inspectors; and (2) various plans that were required to be filed with the Health Department for plan review.

53.     The City sought to pressure Plaintiffs through various methods of coercion.

54.     For instance, the influence of the City against Plaintiffs was evident in the attendance of third parties at routine hearings involving Plaintiffs.

55.     By example, at a hearing in December 2006 regarding an issue involving electrical violations pending against Plaintiffs, the City solicitor introduced, _inter alia_, Plaintiffs' neighbors to the L&I Review Board, although none of the neighbors were witnesses.

56.     Also in attendance at the December 2006 electrical hearing, *inter alia*, were Defendant Blackwell's Chief of Staff, the SHCA, the RSCA, Michael Flis of the Health Department and a representative of USP.

57.     It was certainly unusual to have so many spectators at a routine hearing.

58.     Further, Defendant Blackwell's Chief of Staff frequently attended hearings involving Plaintiffs and once remarked to Plaintiffs' neighbors that if they wanted to shut down Mill Creek Tavern "they need to make it a nuisance bar."

59.     By December 2006, Mill Creek Tavern had corrected all alleged critical violations in the Health Department Case and had passed at least two consecutive Health Department inspections with no critical violations.

60.     As of December, 2006, the only issues remaining before the court (Judge Silberstein of the Philadelphia Municipal Court) in the Health Department Case were: (1) final approval of the plans (which had to be submitted on three separate occasions due to alleged administrative snafus, such as the Health Department losing the filing fee submitted by Plaintiffs); and (2) payment of the plan review fees and inspections costs.  The case was continued to allow resolution of these issues.

61.     In January 2007 the Health Department Case was transferred to a new judge (Judge Allen of the Philadelphia Court of Common Pleas) and again the City stated in a hearing on or about January 25, 2007, that the only issues were inspection costs and final approval of the plans which had been submitted.  The case was continued for sixty days to allow final resolution of these two issues.

62.     In March 2007, the Health Department Case was again transferred to a new judge (Judge Greenspan of the Philadelphia Court of Common Pleas), and in a hearing on or

about March 29, 2007 the City suddenly claimed, for the first time, that the case could not be closed because there was a problem with the plans as submitted. The City asked for the case to be continued for another thirty days.

63.     Before each new hearing on the Health Department Case, the Health Department conducted another inspection of Mill Creek Tavern at a further cost to Plaintiffs, and therefore, the longer the claims dragged on against Plaintiffs, the greater the expense incurred.

64.     Nevertheless, Health Department inspections of Mill Creek Tavern on or about May 9, 2007 and June 18, 2007 found no critical violations.

65.     By June of 2007, Mill Creek Tavern had again passed two consecutive Health Department inspections with no critical violations, however the Health Department continued to allege that they had not received what they needed with regard to the plans. The case was therefore continued again, with the final approval of the plans as the only remaining issue.

66.     By the summer of 2007, the Plan Review Board Unit of the Health Department ("PRBU") would allege critical violations and/or problems with the plans as submitted and Plaintiffs would correct these violations and/or submit corrections or updates to the plans as requested only to have the Health Department allege new critical violations or new reasons to deny final approval of the plans causing considerable aggravation and expense to Plaintiffs.

67.     The PRBU never inspected the premises because it claimed that it never received the plans submitted by the Plaintiffs. In fact, Plaintiffs still do not have a food preparation license although all of the necessary paperwork had been submitted to have this license processed and approved.

11

68.     Additionally, during the summer of 2007, the litigation between the Health Department and Plaintiffs had been going on for over a year, but finally appeared to be substantially resolved because the only remaining issue was final approval of the plans which had been submitted to the Health Department by Plaintiffs.

69.     However, on or about August 3, 2007, the Health Department again inspected Mill Creek Tavern and again alleged new critical violations, including mouse and roach infestation.  On information and belief, these allegations were baseless and/or exaggerated and intended solely to prolong the litigation and to continue the Health Department's campaign, in conspiracy with Defendant Blackwell, to close Mill Creek Tavern and drive Plaintiffs out of business.

70.     On or about August 8, 2007, the City appeared in court before a new judge (Judge Rau of the Philadelphia Court of Common Pleas) and asked for an Order closing Mill Creek Tavern.  Inspector Flis of the Health Department testified regarding the alleged roach and mouse infestation and other alleged violations.  Mr. McKeone, the day manager for Mill Creek Tavern, testified regarding the active steps taken by Mill Creek Tavern, such as repeated weekly visits by an exterminator, to correct all the outstanding violations.

71.     After hearing testimony and arguments, and consulting Judge Greenspan's notes from the previous hearings, Judge Rau found that Mill Creek Tavern was actively working to address the allegedly recurring problems (such as mouse infestation) and that other alleged critical violations were new (i.e. fly infestation and fruit fly infestation).

72.     Judge Rau therefore denied the request to order a closing and instead allowed Mill Creek Tavern to remain open with an opportunity to correct the alleged violations. A new hearing date was set for later in the month.

73.     On or about August 17, 2007, Inspector Derrick High of the Health Department conducted an inspection of Mill Creek Tavern alleging only one critical violation (no food safety certified personnel present).

74.     On or about August 23, 2007, in a hearing before Judge Rau, the City and Plaintiffs reached an agreement that Mill Creek Tavern would obtain a permanent food safety certificate, that Plaintiffs would await final approval of the plans previously submitted to the Health Department, and that Plaintiffs would pay the outstanding balance of inspection costs.

75.     The Assistant City Solicitor (John Manos) confirmed to the Court that everything had been done to the City's satisfaction.  The Health Department Case was re-listed for ninety days, with the next hearing scheduled for November 20, 2007.

76.     While all inspection costs have been paid, the plans still have not been approved.  To date, Plaintiffs have not been issued a food safety certificate.

### L&I's Involvment

77.     On information and belief, having failed to shut down Mill Creek Tavern under color of enforcement actions brought by the Health Department, Defendant Blackwell contacted official(s) with L&I in order to seek closure of the Mill Creek Tavern under color of the enforcement powers of L&I, including the Nuisance Task Force.

78.     On information and belief, Defendant Blackwell and/or members of her staff or other agents of Blackwell acting under her direction, contacted senior officials and supervisors of L&I and requested their assistance in shutting down the Mill Creek Tavern.

79.     Defendant Blackwell's actions in contacting senior officials and supervisors of L&I were not actions in her legislative capacity nor were they the good faith actions of a public official responding to violations of the law.  To the contrary, Defendant

13

Blackwell acted at all times without regard to the actual facts of the situation or the due process rights of Plaintiffs and instead acted arbitrarily and capriciously to deprive Plaintiffs of their use and enjoyment of their property and their protected liberty interest in operating their business.

80.     On information and belief, in response to the request of Defendant Blackwell or her agents, senior officials and supervisors L&I entered into a conspiracy with Defendant Blackwell and made the deliberate decision to shut down Mill Creek Tavern under color of L&I violations.

81.     At all times relevant, the City has delegated to L&I final policymaking authority for all matters related to licenses, permits, fire safety, electrical safety, inspections related to these matters, and all other licensing and permitting matters for all commercial establishments, including bars and restaurants, which operate in the City.  This policymaking authority includes the authority to enforce all City laws, regulations and ordinances dealing with licensing, permitting and safety, to conduct inspections, issuing notices of violations, and otherwise act as the decision-makers as to which commercial establishments may operate in the City.

82.     At all times relevant, senior officials and supervisors of the L&I are and were delegated final policymaking authority with regard to licenses, permits and safety at commercial establishments in the City.

83.     At all times relevant, senior officials and supervisors of L&I were aware of and approved of the actions of their subordinates.

84.     On or about October 20, 2007, Inspector N. Rosado of the L&I Business Compliance Unit, conducted a "Business Compliance" inspection of Mill Creek Tavern and cited Mill Creek Tavern for operating without a business privilege license (even though UVC had one

since 1986); a food preparation license (which L&I would not renew because of the Health Department); a private dumpster license (which UVC had for 10 or more years); and public assembly license (which was a new license at the time) and for failure to display these licenses.

85.     Inspector Rosado claimed to have no knowledge of the licenses and permits that UVC had obtained and which should have been in L&I records but allegedly were not.

86.     By November 2007, it was clear that the City was using every means at its disposal to shut down Mill Creek Tavern.  Steven Martorano, acting as a representative on behalf of Plaintiffs, met with Inspector Gassman and Cheryl Gaston of the City Law Department to address the violations being issued to Plaintiffs.

87.     During the meeting in or around November 2007 with Mr. Martorano, Inspector Gassman and Ms. Gaston advised him that "Mill Creek Tavern will never open again" and that the bar was a "deathtrap" according to the City.

88.     On or about November 6, 2007, Inspector Rosanova conducted fire and safety inspections of Mill Creek Tavern, alleging numerous violations.  Inspector Rosanova also issued a citation for alleged blocked and locked exits.

89.     On or about November 6, 2007, Inspector Gassman conducted an electrical inspection of Mill Creek Tavern, alleging numerous violations.

90.     Many of the violations alleged by Inspector Gassman for the 4202 Chester Avenue portion of Mill Creek Tavern (the portion operated as Track-n-Turf since 1986) were based on the then current electrical code rather than the electrical code current at the time 4202 Chester Avenue was first inspected and permitted to be occupied by L&I in 1986.

91.     By operation of law, Mill Creek Tavern's electrical systems, accepted and permitted by L&I at the time they were installed, did not need to be updated and brought up to the current code in November 2007; the electrical system was "grandfathered" and therefore no changes were required.

92.     Inspector Gassman claimed to have no knowledge of any L&I records for Track-n-Turf and/or Mill Creek Tavern which records would have shown that the original premises of 4202 Chester Avenue were grandfathered and permitted to operate under the then current electrical code.  Instead, Inspector Gassman insisted that the entire Mill Creek Tavern (4200 and 4202) had to be renovated to meet the current electrical code.

93.     The L&I inspectors claimed that Mill Creek Tavern did not have proper zoning nor various necessary permits such as a lawful occupancy permit.

94.     Gillespie was not present at Mill Creek Tavern at the time of the inspections. When reached by phone, Gillespie was informed by one of the L&I inspectors that there was no record of building permits, inspections, zoning and other necessary documentation and permits and that, in fact, the establishment did not exist in their system.

95.     On or about November 6, 2007, Inspectors Rosanova and Gassman stated that L&I would shut down Mill Creek Tavern in two days if certain of the alleged fire, safety, and electrical violations were not corrected within those two days.

96.     On or about Wednesday, November 7, 2007, Kevin Daly, Chief of the Nuisance Task Force of L&I ("Nuisance Task Force"), wrote to Gillespie advising him that Mill Creek Tavern would be shutdown on Friday, November 9, 2007, if the violations were not corrected by then.

97.     On information and belief, L&I personnel, including Gassman, Rosanova and Daly, were aware that it would be virtually impossible for Mill Creek Tavern to correct all the alleged violations within two days.

98.     The Nuisance Task Force directed that Mill Creek Tavern was to be closed down from November 9, 2007 through November 22, 2007, although Plaintiffs did not receive the written notice of violation until approximately a week later (the first floor of the 4200 Chester Street side of Mill Creek Tavern was allowed to open on November 16, 2007 after a meeting with representative of the City and Plaintiffs).

99.     On information and belief, L&I usually gave establishments thirty days to correct violations similar to those alleged against Mill Creek Tavern and the two-day deadline was therefore imposed arbitrarily and capriciously in order to force the immediate shut down of Mill Creek Tavern.

### Mill Creek Fights to Keep Its Doors Open

100.     On November 9, 2007, John Gillespie and UVC, Inc. filed a Complaint and accompanying Petition for Special Injunction in the Philadelphia Court of Common Pleas in an action captioned Gillespie and UVC, Inc. v. City of Philadelphia Department of Licenses & Inspections (November Term 2007, No. 935) ("the L&I Case"), requesting an Order permitting Mill Creek Tavern to continue operations.

101.     L&I's Nuisance Bar Unit closed Mill Creek Tavern from November 9, 2007 to November 15, 2007 for electrical violations.

102.     On or about November 15, 2007, counsel for Gillespie and UVC met with attorneys from the City and inspectors from L&I.

103.   At the meeting, the L&I inspectors again claimed that Mill Creek Tavern did not have and must obtain a variety of permits.

104.   Further, counsel for Gillespie and UVC and attorneys for the City reached an agreement that the renovated section of Mill Creek Tavern (4200 Chester Avenue) would be allowed to reopen upon correcting certain violations relating primarily to certification of the fire and safety systems, and Mill Creek Tavern would then have thirty days to correct the remaining violations.   The second floor of Mill Creek Tavern and the section of the bar located at 4202 Chester Avenue (the Track-n-Turf) would remain closed.

105.   On or about November 16, 2007, Mill Creek Tavern obtained annual certifications for the fire alarm system, standby and emergency lighting system, and fire suppression system and provided these to Inspector Gassman.

106.   On or about November 16, 2007, upon receipt of the updated certifications, Mill Creek Tavern was permitted to re-open and it re-opened at that time.

107.   On or about November 16, 2007, Mill Creek Tavern was inspected by the Health Department and no critical violations were found.

108.   On November 20, 2007, a hearing was held in the continuing Health Department case before Judge Rau.

109.   This was the first hearing in that case since August 23, 2007, at which time there had been no outstanding issues other than final approval of the plans.

110.   The City now claimed to have not received payments that had, in fact, been paid by Plaintiffs.

111.    The City also claimed that the Health Department had been unable to inspect Mill Creek Tavern due to the shutdown by L&I and that therefore two more inspections were necessary.

112.    Additionally, for the first time, the City, and specifically Bernard Finkel of the Health Department, raised an additional issue of the food license and whether it was valid for both addresses.

113.    After testimony and argument, including discussions off the record and during a recess, an agreement was reached before Judge Rau that the Health Department would conduct further inspections, and the matter was re-listed for one week.

### The Thanksgiving Raid

114.    On or about November 21, 2007, **the day before Thanksgiving**, acting on unfounded allegations by person or persons at L&I that Mill Creek Tavern was operating without proper zoning and making off-premises sales, the Pennsylvania State Police, Bureau of Liquor Control Enforcement ("LCE") conducted an inspection of Mill Creek Tavern.

115.    It is well known that the night before Thanksgiving through Thanksgiving weekend is a very busy and hence lucrative time for most restaurants and bars such as Mill Creek Tavern.

116.    Inspectors Gassman, Adams and Rosanova accompanied the LCE officers, revoked Mill Creek's business license, and L&I ordered Mill Creek Tavern closed effective immediately and the bar was shut down from approximately 3:00 p.m. to 5:15 p.m.  Gillespie was advised that Mill Creek Tavern would be treated as a "speak easy."  However, the LCE issued no violations.

117.    On November 27, 2007, in a hearing before Judge Rau in the Health Department case, the City again asked for a continuance because the Health Department had allegedly been unable to inspect Mill Creek Tavern.   Judge Rau again granted a one-week continuance.

### The Missing L&I Files

118.    Plaintiffs needed to provide L&I copies of its existing permits in order to correct any remaining violations.   However, Plaintiffs did not have copies of the permits in their possession and L&I claimed that the permits did not exist.

119.    Plaintiffs were concerned about locating the necessary permits because City officials had often advised them that "Mill Creek Tavern did not exist in the computer" even though at that time, upon information and belief, L&I files were not kept on a computer system.

120.    In order to locate permits that L&I claimed Plaintiffs did not have, Gillespie and representative of Plaintiffs went to the West Division offices and obtained the paper file for Mill Creek Tavern which contained many of the permits and other records which the L&I inspectors had insisted Mill Creek Tavern had never obtained and which had precipitated the shutdown of the business.

121.    Upon information and belief, all L&I permits are originated from the Philadelphia Municipal Services Building ("MSB") and are then sent to the L&I division offices.

122.    In early December 2007, Steven Martorano went to inspect Mill Creek Tavern's file at the MSB and, strangely, the file was missing.

123.    In late December 2007, after being unable to locate the MSB file containing their permits, applications, licenses, etc., Plaintiffs called their contacts at the City to locate the missing file.

124.    Gillespie was advised by a City official that "some politician" was trying to shut down Mill Creek Tavern.

125.    Within an hour of meeting with certain City officials, Plaintiffs were advised that the MSB file had been located, although to date Plaintiffs have never seen this file.

126.    Upon information and belief, acting at the behest of Defendants and/or other conspirators, an employee and/or employees of L&I intentionally deleted and/or intentionally misplaced the records maintained by L&I related to the zoning, building permits for the renovations of Mill Creek Tavern, and other licenses and permits related to the operations of Mill Creek Tavern.

127.    Upon information and belief, Defendants hid or intentionally misplaced Plaintiffs' L&I file to further delay and obstruct the operation of Plaintiffs' business.

### The L&I and LCE Return

128.    On December 1, 2007, the LCE and L&I (Inspectors Adams and Gassman) again conducted a raid of Mill Creek Tavern and closed the premises from December 1, 2007 to December 5, 2007.  L&I conducted an electrical inspection and issued two violation notices.

129.    On December 6, 2007, in a hearing before Judge Tereshko in the Health Department case, the City again asked for a re-listing because the Health Department had been unable to conduct an inspection due to Mill Creek Tavern being closed.

### Judge DiVito  Issues an Injunction Against the City

130.    Meanwhile, also on December 6, 2007, the first hearing in the L&I Case was conducted before Judge DiVito.  Judge DiVito heard testimony regarding the fire and electrical inspections and the L&I/LCE shutdown.

131.    Following the hearing, Judge DiVito issued a Special Injunction Order requiring L&I to conduct a re-inspection within seven days, permitted Mill Creek Tavern to continue operations on the first floor of 4200 Chester Avenue in the interim, and scheduling a hearing for December 19, 2007.

132.    Mill Creek Tavern, which was shut down by L&I on December 1, 2007, was re-opened on December 6th after Judge DiVito issued his Special Injunction Order.

133.    The December 6, 2007 Order also prohibited L&I from entering on the Mill Creek Tavern premises or otherwise interfering with the lawful conduct of its business.

134.    On December 7, 2007, Michael Flis of the Health Department conducted a health department inspection and alleged critical violations including mouse infestation. He also issued a citation alleging that people were smoking in the establishment.

135.    Meanwhile, Gillespie and UVC retained electricians (Martin A. DiVergigilis t/a All Trades, Inc., who in turn retained Ricky Boyd t/a Alpha & Omega Electric as an electrical sub-contractor) and electrical inspectors (Middle Atlantic Inspections), who performed significant work on the premises, correcting all major violations alleged by L&I.

136.    Plaintiffs incurred expenses of at least $122,909.71 for the extensive electrical work.

137.    At all times relevant, Plaintiffs were also required to pay fees to the City for each inspection by L&I and the Health Department, whether necessary/warranted or not.

138.    Gillespie was informed by L&I inspectors that he could perform electrical work prior to obtaining a permit, but that a permit must be obtained when the work is completed.

139.    On or about December 12, 2007, Mr. Howard Pinto, a licensed electrical inspector in the City, inspected the work done at 4202 Chester Avenue and certified the work as having passed inspection, subject to obtaining appropriate permits.

140.    Gillespie left a message with Inspector Rosanova requesting a re-inspection on December 12th.  Martin DiVergigilis was present at Mill Creek Tavern the entire afternoon of December 12th but L&I inspectors never arrived.

141.    On December 13, 2007, Inspectors Gassman, Rosanova and a third inspector conducted a third inspection of Mill Creek Tavern.  The inspectors did not leave any paperwork or otherwise inform Gillespie or any other Mill Creek employees of any outstanding violations, despite their knowledge of the hearing before Judge DiVito scheduled for December 19, 2007.

142.    Prior to the December 19th hearing, an attorney for Mill Creek Tavern contacted the City attorney and left a message requesting any paperwork regarding the inspections made on December 13, 2007 so that Mill Creek could address any claims that there were remaining violations.  The City attorney did not return the phone call or otherwise contact Mill Creek Tavern's attorney prior to the hearing.

143.    Ricky Boyd went to L&I on or about December 17, 2007 to obtain electrical permits for the work at Mill Creek Tavern.  L&I intentionally prolonged the process, only issuing the permits at 5:00 p.m. on December 18, 2007.

144.    On December 19, 2007, a hearing was held before Judge DiVito in the L&I Case.

145.    Gillespie represented that all the violations had been corrected (except arguably one related to dual electrical service to the buildings which was being addressed) and

that having received no feedback from L&I regarding the re-inspection they could only assume that they had properly corrected all violations.

146.    However, in response, the City asserted that no violation notices were issued because the original violation notices were still outstanding and that nothing was corrected.

147.    Faced with these conflicting accounts, Judge DiVito took testimony from Martin DiVergigilis, Gillespie, and Inspectors Gassman and Rosanova.  Both DiVergigilis and Gillespie testified to the extensive work that had been done at Mill Creek Tavern.

148.    Gassman and Rosanova testified as to numerous remaining violations notwithstanding the extensive work performed at the establishment.

149.    Judge DiVito, stunned by L&I's testimony that Mill Creek Tavern's electrical issues were somehow _worse_ after incurring over $100,000.00 in improvements, advised that he would personally inspect Mill Creek Tavern on January 8, 2008.

150.    Meanwhile, Judge DiVito's Order permitting the Mill Creek Tavern to operate on the first floor of 4200 Chester would remain in effect.

151.    On or about the morning of December 20, 2007, the L&I Chief of Electrical License Issuance (on information and belief, Mr. Jim Moria), summoned Mr. Boyd (the electrician who had worked on Mill Creek Tavern and obtained the permits) and Mr. Pinto (the electrical inspector) to his office, and, in the presence of Inspector Gassman, threatened to revoke their licenses for "buying the permit" and other alleged offenses.  He also stated that Mr. DiVegigelis would never work in the City again.

152.    Counsel for Plaintiffs advised Judge DiVito in a December 20, 2007 letter that L&I was attempting to intimidate witnesses in violation of the Court's December 6, 2007 Order.

153.    On or about the afternoon of December 20, 2007, Inspectors Gassman and Rosanova conducted an additional inspection of Mill Creek Tavern.

154.    That inspection violated the December 6, 2007 Order still in effect prohibiting L&I from entering onto the Mill Creek Tavern premises or otherwise interfering with the lawful conduct of the business.  Nonetheless, the results of this inspection showed that many items had been corrected.

155.    In the course of this inspection, Inspectors Gassman and Rosanova informed employees of Mill Creek Tavern that they would revoke the permits obtained by Mr. Boyd for electrical work.  They also told the cook at Mill Creek Tavern that he should look for a new job because he would not have a job in thirty to forty-five days.

156.    On or about December 28, 2007, Inspectors Gassman and Rosanova conducted another inspection of Mill Creek Tavern again in violation of the Order of December 6, 2007, still in effect, which prohibited L&I from entering onto the Mill Creek Tavern premises or otherwise interfering with the lawful conduct of the business. Nonetheless, the results of this inspection showed that many remaining items had been corrected.

157.    By December 28, 2007, having spent over $100,000.00 in electrical and other work, Mill Creek Tavern had corrected all alleged fire and safety and electrical violations stemming from the inspections initially conducted by L&I on November 6, 2007.

158.    Having failed to close Mill Creek Tavern under color of L&I enforcement of alleged fire, safety and electrical violations, Defendants once again turned to the Health

Department and continued their campaign to close Mill Creek Tavern under the pretext of Health Department violations.

159.    On January 4, 2008, the Health Department conducted an inspection of Mill Creek Tavern.

160.    The inspector physically removed the valid food preparation license from the wall, alleging that Mill Creek Tavern was not properly licensed because they had not filed plans with the Plan Review office.

161.    Additionally, the Health Department inspector cited Mill Creek Tavern for a smoking violation, claiming to have found "evidence of smoking" due to a cigarette butt on the second floor (which was closed at the time to the public).

162.    On or about January 8, 2008, a hearing was held in the Health Department case before Judge Tereshko.

163.    At that time, the City attorney misinformed the Court that no inspection had been conducted because Mill Creek Tavern was closed by Order of Judge DiVito.   In actuality, only part of Mill Creek Tavern was closed (the second floor and the Track-n-Turf section).  The case was continued for 30 days.

164.    On the same day, January 8, 2008, Mr. Kevin Daly of L&I came to Mill Creek Tavern in lieu of the inspection scheduled to occur in the presence of Judge DiVito and met with Gillespie and others including counsel for Gillespie and UVC.

165.    Mr. Daly lifted the Cease Order imposed by L&I, granted a temporary Certificate of Occupancy for Mill Creek Tavern to operate in the entire premises, and stated that a permanent Certificate of Occupancy would be issued once final fire alarm and emergency lighting certifications had been received by L&I.

166.    Clearly, L&I was attempting to avoid having Judge DiVito personally inspect the electrical work performed at Mill Creek Tavern.

167.    On January 9, 2008, Judge DiVito, acting on the request of Gillespie and UVC, amended the Court's December 6th Order and by Order dated January 9, 2008 permitted Mill Creek Tavern to operate on the first and second floors of 4200 and 4202 Chester Avenue, which had been closed since November 16, 2007.

168.    On January 9, 2008, in the Health Department case, Judge Tereshko issued an Order closing Mill Creek Tavern until certified to be re-opened by the Health Department. The City represented that Gillespie had voluntarily agreed to close when this was not the case.

169.    Plaintiffs would not find out about the existence of Judge Tereshko's Order until Super Bowl Weekend approximately three weeks later.

170.    On January 9th, L&I confiscated Mill Creek Tavern's health license and returned it the next day.

171.    On or about Saturday, January 26, 2008, Mandi Davis of the Health Department arrived at Mill Creek Tavern citing Judge Tereshko's January 9th Order in an attempt to close the establishment.

172.    Upon inquiry by counsel for Gillespie and UVC, the City Law Department took the position that Judge Tereshko's Order closing Mill Creek Tavern for reasons of health code violations was valid and binding notwithstanding Judge DiVito's Order in the L&I Case. The City insisted that Mill Creek Tavern being open after January 9, 2008 was illegal and raised the possibility of contempt charges for operating after that date.

173.    On February 1, 2008, after being informed that Judge DiVito had been handling matters involving Mill Creek Tavern, Judge Tereshko vacated the previous Order *ab initio* by order that same date.

### The Super Bowl Inspection

174.    On Saturday, February 2, 2008, **during the weekend of the Super Bowl**, and approximately three weeks after obtaining an Order from Judge Tereshko, Inspector Nemchik of the Health Department arrived at Mill Creek Tavern to close the establishment citing Judge Tereshko's (vacated) January 9th Order.  Plaintiff Gillespie was present and showed the Inspector the February 1st Order which vacated the January 9th closure order.

175.    It is well known that the Super Bowl is very busy and lucrative for most bars and restaurants such as Mill Creek Tavern.

176.    Undeterred in L&I's efforts to shut down Mill Creek Tavern, Inspector Nemchik conducted another inspection, alleging two critical violations.

### Judge DiVito Assumes Exclusive
### Jurisdiction Over All Cases Involving the City and Plaintiffs

177.    On February 4, 2008, Judge DiVito, presiding over the L&I Case, issued an Order that the City attorney in the Health Department case attend the hearing before Judge DiVito scheduled for February 7, 2008.

178.    On February 7, 2008, following the City's attempt to circumvent the injunctive Orders issued by Judge DiVito, a hearing was held before Judge DiVito in which he ordered that he would assume exclusive jurisdiction over all matters involving the City of Philadelphia and any agency thereof and Plaintiffs.

179.    Judge DiVito directed that in the future, any and all matters between the City and Gillespie/UVC were to be brought before the Court and heard only by him and he gave

forty days for the Health Department to conduct another inspection and resolve the Health Department issues and scheduled a status hearing for April 28, 2008 (which was later changed to April 8, 2008).

180.   The Health Department Case and the L&I Case were officially consolidated before Judge DiVito by Order dated February 7, 2008.

181.   In a continued diligent attempt to resolve all Health Department allegations, Mill Creek Tavern continued with extensive extermination activity and provided proof of such activity to the City Law Department.

182.   On April 7, 2008, Inspector James Logan of the Health Department conducted an inspection of Mill Creek Tavern and alleged two critical violations, namely mouse infestation and no food safety certified personnel present.

183.   On April 8, 2008, a hearing was held before Judge DiVito in the consolidated cases.

184.   At the time it appeared that the parties had reached an understanding: Mill Creek Tavern would continue with its extermination activities and would bring in exterminators once a week rather than once every two weeks, and more employees would be enrolled in food certification classes (so that there would be a food safety certified person present at all times). The Health Department would re-inspect in two weeks.

185.   Furthermore, the plan review issue was still outstanding because Mill Creek Tavern and the Health Department had repeatedly gone back and forth from having filed the plans, to there being some alleged problem with the plans, and so on.

186.   As for the L&I matters, the only remaining issue was final issuance of a public assembly license.

187.    Judge DiVito gave sixty days for all the above issues to be resolved, stating that if they were not resolved at that time he would set aside time for a complete hearing during which he expected to hear testimony from all the City departments regarding what was happening with Mill Creek Tavern.

188.    By letter dated April 9, 2008, the City attorney confirmed to counsel for Plaintiffs that the plan review had been completed, but that payment of $1,940.00 was still required.  Meanwhile, there would be another Health Department inspection in two weeks, a final inspection approximately two months later, and if there were no critical violations and the inspection fees were paid, the matter would be taken out of court.

189.    In early or mid June, 2008, Gillespie paid all outstanding inspection and plan review costs.

190.    On June 16, 2008, Inspector Logan of the Health Department inspected Mill Creek Tavern and alleged three critical violations: fly infestation, mouse infestation and no food safety certified personnel present.

191.    On July 28, 2008, Inspector Grover of the Health Department inspected Mill Creek Tavern and alleged seven critical violations: unprotected ice, fly infestation, fruit fly infestation, mouse infestation, ant infestation, a broken drain line and no food safety certified personnel present.

192.    On July 29, 2008, a hearing was held before Judge DiVito in the consolidated cases.

193.    At that time, the City represented that they could not close the case because the City needed a few more weeks to resolve the Health Department issues, citing the recent inspections.

194.     Counsel for Plaintiffs explained that Mill Creek Tavern was exterminating once a week and cleaning every night and more extensively on weekends, yet was somehow never able to satisfy the Health Department.

195.     Furthermore, employees had taken and passed the food safety courses and were only waiting for the Health Department to issue the certified food handler licenses.

196.     Again, Judge DiVito stated that he would set a date to personally go and see the condition of the restaurant in order to resolve these issues.

197.     Since Judge DiVito advised that he was going to personally inspect Mill Creek Tavern, there have been no further inspections or violations issued by L&I or the Health Department.

## Gillespie Seeks to Build A Roof Deck

198.     In September 2008, Gillespie applied to L&I for a permit to erect a roof deck.

199.     L&I denied the request for a permit determining that he needed to obtain a variance.

200.     Gillespie filed an appeal of L&I's decision with the ZBA.   The ZBA denied Gillepie's appeal on April 1, 2009, but it did not mail the denial of the appeal on May 1, 2009, after the 30 day statutory appeal period.

201.     As a result of ZBA's arbitrary and capricious conduct, Gillespie was required to again spend significant time and expense seeking to appeal the decision of the ZBA *nunc pro tunc*.  This issue is still pending.

## The Water Department Action Is Resolved

202.   Most recently, based on a Petition filed in the Water Action by the City to Sell the Property Free and Clear of All Encumbrances, on June 19, 2009 a Rule was issued to show why the relief requested should not be granted.

203.   Although Gillespie had resolved the amount claimed in the Water Action and counsel for Gillespie was advised that the action would be dismissed based on the payment, subsequent to June 2009, the City actually sent notices to Gillespie's tenants at 527 South Chester Avenue advising that rent should not be paid to Gillespie because the building was being sold.

204.   When contacted by counsel for Gillespie, the City admitted that it had no basis to order the sale.

## The Defendants Have Violated Plaintiffs' Rights

205.   The above sets forth a multitude of improper activities taken by the Defendants in an effort to harass Plaintiffs and ultimately shut down Mill Creek Tavern.

206.   Plaintiffs have been damaged and continue to suffer damage including, but not limited to, attorneys' fees, inspection costs, over $100,000.00 in unnecessary electrical work, based on Defendants' continuing conduct.

**COUNT I**
**Plaintiffs v. All Defendants**
**(Violation of 42 U.S.C. § 1983**
**Substantive Due Process)**

207.   Plaintiffs incorporate by reference all paragraphs above as if set forth at length herein.

208.    Under the Civil Rights Act, 42 U.S.C. § 1983 no person acting under the color of state law may deprive a person of rights protected by the United States Constitution or federal law.

209.    With respect to the actions set forth in this Complaint, Defendants Blackwell, Gassman and Rosonova (collectively referred to as the "City Officials") have at all times acted "under the color of state law." Each of the City Officials has acted in their official capacity and in their individual capacity.

210.    It is the official custom, policy and/or practice of the City to deprive Plaintiffs of their ability to conduct their business and to interfere with their constitutionally protected rights.

211.    Pursuant to the 14th Amendment of the United States Constitution, no person shall be deprived of life, liberty or property without due process of law.  Plaintiffs are "persons" within the meaning of the 14th Amendment.

212.    Pursuant to the 14th Amendment of the United States Constitution, Plaintiffs have "property interests" in:

a.    the ability to use and enjoy their property;

b.    the right to conduct their business without adversely affecting public health, safety and welfare; and

c.    their business reputation.

213.    Pursuant to the 14th Amendment of the United States Constitution, Plaintiffs have "liberty interests" in:

a.    the right to be free from harassment from public officials;

b.      the right to be free from false, baseless and/or exaggerated accusations of violations of City laws, regulations, and/or ordinances; and

c.      the right to be free from misuse of the civil process.

214.    As more full set forth above, the City and City Officials have deprived Plaintiffs of their constitutionally-protected substantive due process rights by, among other things:

a.      impeding their ability to use and enjoy their property;

b.      impeding their ability to operate their business;

c.      conducting numerous inspections for the purpose of harassment and intimidation;

d.      charging them with legally and factually baseless violations of the City laws, regulations and/or ordinances;

e.      exaggerating minor violations of the City laws, regulations and/or ordinances and imposing inordinate penalties and costs;

f.      destroying, hiding or otherwise manipulating City records;

g.      using police power to harass Plaintiffs and the owners, managers and employees of Mill Creek Tavern;

h.      unreasonably delaying the issuance of approvals and permits to which Plaintiffs and their agents are entitled;

i.      abusing civil process for the purpose of harassment and intimidation;

h.      tarnishing Plaintiffs' reputation in the business community and the City; and

i.      treating Plaintiffs in a disparate manner that other businesses and citizens of the City.

215.    Defendants acted in bad faith, with improper motive and in a manner which shocks the conscience in depriving Plaintiffs of their constitutional rights. Moreover, the actions and decisions of Defendants are not rationally related to any legitimate government interest.

216.    The City has adopted an anti-Gillespie and anti-UVC position and made it the official custom, policy and/or practice of the City.

217.    As a direct and proximate result of the actions of Defendants, Plaintiffs have sustained and continue to sustain substantial damages.

218.    As a direct and proximate result of the Defendants' activities, Gillespie has suffered severe emotional distress and mental anguish.

219.    The actions of the Defendant City Officials are intentional, willful, wanton and/or reckless and so outrageous as to warrant the imposition of punitive damages.

220.    Pursuant to the Civil Rights Act, 42 U.S.C. § 1988(b), Plaintiffs are entitled to recover all of their costs, including attorneys' fees, associated with the prosecution of this litigation and the protection of their constitutional rights.

WHEREFORE, for the foregoing reasons, Plaintiffs respectfully request this Court to enter judgment in their favor and against Defendants for (i) compensatory damages in an amount in excess of $150,000.00, plus prejudgment and post-judgment interest; (ii) punitive damages in an amount this Court deems to be just and proper; (iii) their costs, including attorneys' fees incurred in pursuing this litigation and protecting their civil rights; and (iv) any such further relief as the Court deems to be just and proper.

## COUNT II
### Plaintiffs v. All Defendants
### (Violation of 42 U.S.C. § 1983
### Equal Protection)

221. Plaintiffs incorporate by reference all paragraphs above as if set forth at length herein.

222. Under the Civil Rights Act, 42 U.S.C. § 1983, no person acting under the color of state law may deprive a person of rights protected by the United States Constitution or federal law.

223. With respect to the actions set forth in this Complaint, the City Official have at all times acted "under the color of state law." Each of the City Officials have acted in their official capacity and in their individual capacity.

224. It is the official custom, policy and/or practice of the City to deprive Plaintiffs of their ability to conduct their business and to interfere with their constitutionally protected rights.

225. Pursuant to the 14th Amendment of the United States Constitution, no person shall be denied equal protection under the laws. Plaintiffs are "persons" within the meaning of the 14th Amendment.

226. Defendants have denied Plaintiffs equal protection by:

a. selectively enforcing the laws, ordinances and regulations of the City against Plaintiffs but not other similarly situated citizens and businesses in the City;

b. selectively using police powers to harass and otherwise interfere with the business activities of Plaintiffs but not other similarly situated citizens and businesses in the City;

      c.      selectively and unreasonably delaying the issuance of approvals and permits to Plaintiffs and/or their employees and/or agents but not other similarly situated citizens and businesses in the City;

      d.      selectively using the civil process to harass and otherwise interfere with the business activities of Plaintiffs but not other similarly situation citizens and businesses in the City; and

      e.      treating Plaintiffs in a disparate manner than other businesses and citizens of the City.

227.    Defendants acted in bad faith and with improper motive discriminating against Plaintiffs and in depriving them of their constitutional right to equal protection under the law. Moreover, the discriminatory actions and decisions of Defendants are not rationally related to any legitimate government interest.

228.    The City has adopted a discriminatory anti-Gillespie and anti-UVC position and made it the official custom, policy and/or practice of the City.

229.    As a direct and proximate result of the actions of Defendants, Plaintiffs have sustained damages in excess of $150,000.00.

230.    As a direct and proximate result of the Defendants' activities, Gillespie has suffered severe emotional distress and mental anguish.

231.    The actions of the Defendant City Officials are intentional, willful, wanton and/or reckless and so outrageous as to warrant the imposition of punitive damages.

232.    Pursuant to the Civil Rights Act, 42 U.S.C. § 1988(b), Plaintiffs are entitled to recover all of their costs, including attorneys' fees, associated with the prosecution of this litigation and the protection of their constitutional rights.

WHEREFORE, for the foregoing reasons, Plaintiffs respectfully request this Court to enter judgment in their favor and against Defendants for (i) compensatory damages in an amount in excess of $150,000.00, plus prejudgment and post-judgment interest; (ii) punitive damages in an amount this Court deems to be just and proper; (iii) their costs, including attorneys' fees incurred in pursuing this litigation and protecting their civil rights; and (iv) any such further relief as the Court deems to be just and proper.

## COUNT III
### Plaintiffs v. All Defendants
### (Conspiracy to violate 42 U.S.C. § 1983)

233.    Plaintiffs incorporate by reference all paragraphs above as if set forth at length herein.

234.    As more fully set forth above, Defendants have conspired, combined and agreed to deprive Plaintiffs of their constitutionally protected rights.

235.    Defendants have acted jointly and reached an agreement to deprive Plaintiffs of their constitutionally protected rights.

236.    In so conspiring, combining and agreeing, the City Officials have at all times acted under color of state law.  It is the official custom, policy and/or procedure of the City to deprive Plaintiffs of their constitutionally protected rights.

237.    Pursuant to the 14th Amendment of the United States Constitution, no person shall be deprived of life, liberty or property without due process of law nor denied equal protection under the laws.  Plaintiffs are "persons" within the meaning of the 14th Amendment.

238.    As more fully stated above, Defendants, acting in conspiracy with one another, have deprived Plaintiffs of their constitutionally protected right by, among other things:

a.    impeding their ability to use and enjoy their property;

b.      impeding their ability to operate their business;

c.      conducting numerous inspections for the purpose of harassment and intimidation;

d.      charging them with legally and factually baseless violations of the City laws, regulations and/or ordinances;

e.      exaggerating minor violations of the City laws, regulations and/or ordinances and imposing inordinate penalties and costs;

f.      destroying, hiding or otherwise manipulating City records;

g.      using police power to harass Plaintiffs and the owners, managers and employees of Mill Creek Tavern;

h.      unreasonably delaying the issuance of approvals and permits to which Plaintiffs and their agents are entitled;

i.      abusing civil process for the purpose of harassment and intimidation;

j.      tarnishing Plaintiffs' reputation in the business community and the City; and

k.      treating Plaintiffs in a disparate manner that other businesses and citizens of the City.

239.    In addition Defendants, acting in conspiracy with one another, have denied Plaintiffs equal protection under law by:

a.      selectively enforcing the laws, ordinances and regulations of the City against Plaintiffs but not other similarly situated citizens and businesses in the City;

      b.     selectively using police powers to harass and otherwise interfere with the business activities of Plaintiffs but not other similarly situated citizens and businesses in the City;

      c.     selectively and unreasonably delaying the issuance of approvals and permits to Plaintiffs and/or their employees and/or agents but not other similarly situated citizens and businesses in the City;

      d.     selectively using the civil process to harass and otherwise interfere with the business activities of Plaintiffs but not other similarly situation citizens and businesses in the City; and

      e.     treating Plaintiffs in a disparate manner than other businesses and citizens of the City.

240.    Defendants have acted in bad faith and with improper motive in conspiring to deprive Plaintiffs of their constitutional rights. Moreover, the actions and decisions of Defendants are not rationally related to any legitimate government interest.

241.    As a direct and proximate result of the actions of Defendants acting in conspiracy, Plaintiffs have sustained damages in excess of $150,000.00.

242.    As a direct and proximate result of the actions of Defendants acting conspiracy, Gillespie has suffered severe emotional distress and mental anguish.

243.    Defendants' actions are intentional, willful, wanton and/or reckless and so outrageous as to warrant the imposition of punitive damages.

244.    Pursuant to the Civil Rights Act, 42 U.S.C. § 1988(b), Plaintiffs are entitled to recover all of their costs, including attorneys' fees, associated with the prosecution of this litigation and the protection of their constitutional rights.

WHEREFORE, for the foregoing reasons, Plaintiffs respectfully request this Court to enter judgment in their favor and against Defendants for (i) compensatory damages in an amount in excess of $150,000.00, plus prejudgment and post-judgment interest; (ii) punitive damages in an amount this Court deems to be just and proper; (iii) their costs, including attorneys' fees incurred in pursuing this litigation and protecting their civil rights; and (iv) any such further relief as the Court deems to be just and proper.

**FILED**

## JURY TRIAL DEMAND

NOV 1 2 2009

Plaintiffs demand a jury on all claims.

MICHAEL E. KUNZ, Clerk
By_____Dep. Clerk


**GREEN, SILVERSTEIN & GROFF, LLC**


By: /s/ Joseph B. Silverstein
    Michael A. Green, Esquire
    Joseph B. Silverstein, Esquire (JBS 2905)
    Joshua D. Groff, Esquire

    1831 Chestnut Street, Suite 300
    Philadelphia, PA  19103
    (215) 972-5520
    (215) 972-5544 (Fax)
    jsilverstein@gsglawfirm.com


Dated: November 11, 2009

## CERTIFICATE OF SERVICE

I, Joseph B. Silverstein, hereby certify that a true and correct copy of the foregoing First Amended Complaint was served via Hand Delivery on the following on this date:

Mr. Daniel Rosanova
c/o City of Philadelphia
Law Department
1515 Arch Street
Philadelphia, PA  19103-1501

Mr. Kenneth Gassman
c/o City of Philadelphia
Law Department
1515 Arch Street
Philadelphia, PA  19103-1501

City of Philadelphia
Law Department
1515 Arch Street
Philadelphia, PA  19103-1501

Ms. Jannie L. Blackwell
City Hall
Room 408
Broad and Market Streets
Philadelphia, PA  19107-3290

**FILED**

NOV 1 2 2009

MICHAEL E. KUNZ, Clerk
By_____Dep. Clerk

/s/ Joseph B. Silverstein
Joseph B. Silverstein, Esquire (JBS 2905)

Dated:  November 11, 2009